# In the United States Court of Federal Claims

No. 20-1050C
(Filed: December 22, 2020)
(Re-Filed: January 7, 2021)[1]

* * * * * * * * * * * * * * * * * * * * * * * *

PROGRESS FOR BAKERSFIELD
VETERANS LLC,

                        *Plaintiff*,

v.

THE UNITED STATES,

                        *Defendant*,

and

SASD DEVELOPMENT GROUP LLC,

                        *Intervenor*.

* * * * * * * * * * * * * * * * * * * * * * * *

    *Elizabeth Newell Jochum*, Washington, DC, for plaintiff, with whom was *Zachary D. Prince*, *Nora K. Brent*, *Jessica L. Nejberger*, and *Robert C. MacKichan, Jr.*, of counsel.

    *Reta E. Bezak*, Trial Attorney, United States Department of Justice, Civil Division, with whom were *Jeffrey Bossert Clark*, Acting Assistant Attorney General*, Robert E. Kirschman, Jr.*, Director, and *Douglas K. Mickle*, Assistant Director, for defendant. *Kathryn M. Downey*, U.S. Department of Veterans Affairs, of counsel.

---

[1] This opinion was originally issued under seal in order to afford the parties an opportunity to propose redactions of protected material. Plaintiff filed an unopposed document with proposed redactions on December 30, 2020 (ECF No. 61). We thus reissue this opinion with the proposed redactions.

*Patrick T. Rothwell, Esq.*, Washington, DC, for intervenor. *Jonathan T. Williams*, *Timothy F. Valley*, and *Jonathan I. Pomerance* of counsel.

OPINION

BRUGGINK, *Judge.*

In this pre-award bid protest, Progress for Bakersfield Veterans, LLC. ("PBV"), alleges that the Department of Veterans Affairs ("VA") unlawfully excluded PBV's three offers from the competitive range and included only SASD Development Group, LLC's ("SASD") offer based on a defective proposal evaluation that was not in accordance with the solicitation or Federal Acquisition Regulation ("FAR") Part 15.  Plaintiff also asserts that the agency showed bias through a preference for SASD's proposal and that the award of a 20-year lease under this solicitation would violate the Anti-Deficiency Act ("ADA"), 38 U.S.C. § 8104.  Plaintiff seeks a permanent injunction requiring the VA to select a new Technical Evaluation Board to conduct an evaluation of all offers in accordance with the solicitation, appoint a new Source Selection Official to make a new competitive range determination and, or alternatively, award determination, and engage in full and open discussions with all offerors included in the competitive range.  The parties have filed cross-motions for judgment on the administrative record, which are fully briefed.  Also pending are defendant's and intervenor's partial motions to dismiss plaintiff's Anti-Deficiency Act ("ADA") and bias claims for failure to state a claim.

Oral argument was held on December 8, 2020.  Because the VA properly documented its decision and its analysis was reasonable, we grant defendant's and intervenors' motions for judgment on the administrative record and deny plaintiff's motion.  Additionally, we grant defendant's and intervenor's partial motions to dismiss regarding plaintiff's Anti-Deficiency Act and bias claims because PBV waived these arguments.

BACKGROUND

On December 9, 2019, the VA issued a solicitation for a 20-year lease of 30,100 square feet of space to be used for a Community Based Outpatient Clinic providing primary, specialty, and mental health care to veterans in Bakersfield, California.  Plaintiff is the incumbent on the contract, which is currently being fulfilled at PBV's existing facility located at 1801 Westwind Drive.

### A.  Prior Solicitation

This solicitation followed a prior solicitation involving the same competition for an outpatient clinic in Bakersfield, California.  In the prior procurement, PBV submitted two proposals, both of which were excluded from the competitive range.  PBV requested a pre-award and post-award debriefing, but the VA did not provide a debriefing to PBV until after it executed a lease with the awardee SASD.  PBV then filed a protest at GAO.  Before GAO reached a decision, the VA filed a notice of corrective action indicating that "because the lease contract [with SASD] d[id] not contain a termination for convenience clause," it could take no further action regarding the lease, but would reimburse PBV its bid and proposal costs as well as its reasonable costs associated with the protest.  Complaint (ECF No. 32 at 5).  Over the objection of PBV, GAO dismissed the protest as academic.  PBV filed a protest with this court on March 4, 2019, seeking to enjoin the award to SASD.  The VA again responded with a notice of corrective action, this time promising that it would reinstate PBV's proposals into the competitive range and engage in discussions with PBV regarding the proposals.  That did not occur, however.  Instead of reinstating plaintiff, the VA canceled SASD's award and issued the current solicitation to begin a new procurement.  The VA sent a notice of cancellation to SASD, directing it to stop all work.

### B.  Current Solicitation

The current solicitation stated that it would use best value trade off source selection procedures to award a firm-fixed price lease to the responsible offeror who represented the best value to the government.  The solicitation allowed offerors to submit multiple bids.  Initially, award offers were due by January 8, 2020, but the deadline was later extended to January 23, 2020.

Offerors were required to submit two proposal volumes, a technical proposal and a price proposal.  The solicitation provided criteria for evaluating each factor.  The solicitation also provided drawings depicting the VA's concept plan for site design, floor plan, and parking.  The Technical Evaluation Board ("TEB") considered the following technical factors, listed in descending order of importance: Technical Quality, Offeror's Qualifications and Past Performance ("Q&PP"), Operations and Maintenance Plan ("O&M Plan"), and the Offeror's Socio-Economic Status.  The solicitation included an adjectival rating scale for evaluation factors which are defined in the description, including: Superior, Highly Successful, Successful, Marginal, or Poor.

3

The Contracting Officer ("CO") evaluated price proposals by using a net present value price evaluation. Both price and the technical factors were given approximately equal weight in determining the best value. The solicitation stated that the VA intended to award without discussions but reserved the right to conduct discussions if the CO determined discussions were necessary. The solicitation also stated that, if the CO was unable to make an award after evaluating all proposals, then a "competitive range comprised of all the most highly rated proposals will be established" with which to conduct discussion. Administrative Record ("AR") 185.

C. Evaluation

The agency received six proposals from four offerors, two of which were considered nonresponsive and were not evaluated by the TEB. The remaining offers were submitted by PBV and SASD and were evaluated by the TEB, composed of members of the procurement team and the Source Selection Authority ("SSA"). The TEB evaluated and documented the strengths, deficiencies, weaknesses and risks associated with the evaluation of each offer.

PBV submitted three alternative proposals, all in Bakersfield, California, two of which were offers to renovate its existing clinic at 1801 Westwind Drive (Westwind Offer #1 and Westwind Offer #2). The third, the [           ] proposal, was an offer for a new clinic. SASD submitted a single proposal for a new clinic in Bakersfield, California.

In its initial evaluation, the TEB rated the remaining four offers for each Technical Proposal evaluation criteria:

| Offeror | Technical Quality | Q&PP | O&M Plan | Socio-Economic Status |
|---------|-------------------|------|----------|-----------------------|
| PBV's [           ] facility | Marginal | Successful | Successful | Neutral |
| PBV's 1801 Westwind #1 facility | Marginal | Marginal | Successful | Neutral |
| PBV's 1801 Westwind #2 facility | Poor | Marginal | Successful | Neutral |
| SASD | Highly Successful | Highly Successful | Successful | Neutral |

AR 10211.

After the TEB's evaluation, the SSA elected to establish a competitive range determination of the most highly rated proposals. The SSA determined, however, that SASD's offer had the highest rating and that none of PBV's three offers were sufficiently highly rated to merit characterization as among the highest rated. She concluded that the difference between the proposals meant that only SASD's offer would be included in the competitive range. The agency sent three letters to the plaintiff on April 21, 2020, notifying PBV that none of its offers were "among the most highly rated proposals considered for inclusion in the competitive range and therefore your offer[s] ha[ve] been eliminated from further consideration." AR 10212-14 (Pre-award Notice of Elimination from the Competitive Range). The VA sent a letter to SASD on April 24, 2020, requesting a revised proposal from SASD. Prior to sending the letter to SASD, the agency conducted discussions with SASD. SASD submitted its revised proposal to the VA on May 4, 2020.

D. PBV's Protests

PBV filed a protest with GAO on May 1, 2020, protesting the VA's decision to remove PBV's proposals from the competitive range. After extensive briefing, GAO conducted outcome prediction alternative dispute resolution advising the parties of the probable outcomes of the issues raised in PBV's protest. In response, the VA filed a notice of corrective action and requested dismissal of the protest from GAO, indicating that it would correct issues GAO identified as "likely to be sustained" or "litigation risks." AR 13677-78. The VA's notice promised to reevaluate offers and issue a new award decision. GAO dismissed the protest as academic.

E. The Reevaluation

The SSA,[2] Ms. Anntwinette Dupree-Hart, and the TEB Chairperson, Ms. Allyson Lee, reassessed the proposals and assigned new adjectival ratings to the technical proposals.[3] The reevaluation focused solely on the four factors of the Technical Proposal evaluation criteria. The TEB

---

[2] The SSA is also the CO for this solicitation.

[3] The SSA and the TEB Chairperson annotated the previous TEB report with colored highlights to remove certain weaknesses and deficiencies from their consideration, as well as upgrade certain other omissions to deficiencies, weaknesses to significant weaknesses, and assess new adjectival ratings.

Chairperson gave SASD the highest ranking among the four proposals submitted because SASD's proposal received Highly Successful ratings for both the Technical Quality and Q&PP factors, "which are the two most heavily weighted factors." AR 13715. PBV's offers received lower rankings because none of PBV's offers received better than a Marginal rating under the Technical Quality and Q&PP factors. All four proposals received a Successful rating for the O&M Plan factor and a Neutral rating for the Socio-Economic Status factor, which are the least weighty factors. The TEB Chairperson's and SSA's reevaluation is described in detail below, with the reevaluation of PBV's three offers detailed first and the reevaluation of SASD's proposal described last.

PBV's Westwind #1 proposal once again received a Marginal Technical Quality rating because the SSA and TEB Chairperson concluded that the proposal contained several significant weaknesses which were not readily correctible, including what they viewed as the space plan's significant departure from the VA's concept plan, the building structure's functional, programmatic, and spatial relationship issues, and the current design's operational problems for managing clinic resources, which would require a major re-design effort. The Westwind #1 offer's Q&PP was once again rated as Marginal because the SSA and TEB Chairperson found that the proposal had significant weaknesses, as plaintiff's proposal failed to provide the required financial statements on the net income or cash flow of PBV's current projects, and thus, the VA was unable to assess PBV's liquid assets, and its ability to fund the project. Additionally, the SSA and TEB Chairperson found that PBV's offer lacked information describing the offeror's approach to successfully complete contract requirements. The Westwind #1 offer's O&M Plan once again received a Successful rating although the SSA and TEB Chairperson found that the offeror's O&M Plan still contained several weaknesses, as it failed to explain how PBV would implement and manage its quality assurance plan, failed to provide detail on how PBV would manage its Operations and Management subcontractor, or identify who would be on site, and did not state the subcontractor's experience level. The Westwind # 1 offer again received a Neutral rating for Socio-Economic Status.

PBV's Westwind #2 proposal again received a Poor Technical Quality rating because the SSA and TEB Chairperson found that the proposal contained numerous weaknesses, including a building interior that appeared to be sterile and not patient-centric and because the floor plan failed to implement the model required by the solicitation. This proposal again received a Marginal Q&PP rating because the SSA and TEB Chairperson found that the proposal still contained deficiencies and weaknesses, as it did

not provide financial statements required by the solicitation regarding the net income or cash flow of PBV's current project, nor did it provide sufficient information on how PBV would approach successful completion of the contract solicitation requirements.  The Westwind #2 proposal again received a Successful O&M Plan rating, as the proposal met the solicitation's minimum requirements.  However, the SSA and TEB Chairperson found that the offeror's O&M Plan still contained weaknesses as it failed to explain how PBV would implement and manage its quality assurance plan.  PBV's Westwind #2 proposal again received a Neutral Socio-Economic status rating.

PBV's [          ] proposal once again received a Marginal Technical Quality rating because the SSA and TEB Chairperson determined that the proposal contained several significant weaknesses which were not readily correctable, including parking discrepancies, failure to present detail regarding its plan for successful contract completion, and failure to explain a strategy for sequencing the work as the solicitation required.  The Q&PP rating was lowered from Successful to Marginal as the evaluators found that the [          ] proposal contained deficiencies and a significant weakness because the proposal failed to provide PBV's net income, required financial statements, information on the income and cash flow of PBV's current project, and detail on how PBV would approach the successful  completion of solicitation requirements.  The O&M Plan again received a Successful rating as the evaluators found that the proposal met the minimum solicitation requirements although the SSA and TEB Chairperson found that the offeror's O&M Plan contained several weaknesses because it failed to explain how PBV would implement and manage its quality assurance plan, failed to provide detail on how PBV would manage its Operations and Management subcontractor, failed to identify who would be on site, and did not state the subcontractor's experience level.  PBV's [          ] proposal again received a Neutral Socio-Economic Status rating.

SASD's proposal again received a Highly Successful Technical Quality rating as the SSA and TEB Chairperson found that the proposal exceeded the VA's evaluation standards by providing a site that appeared well situated near public transportation, amenities, and highways, had multiple entrances, excellent traffic flow, clearly distinguished parking for employees and visitors, a garden, and appealing landscaping.  The offer's Q&PP rating remained Highly Successful as the evaluators determined that the offer provided a strong and detailed financial resources plan, information on SASD's cash on hand to fund up-front costs, and financial statements. SASD's O&M Plan again received a Successful rating because the evaluators found that the offer provided a strong maintenance plan and exhibited a clear

understanding of the VA's requirements.  SASD's proposal again received a Neutral Socio-Economic Status rating.

F.   Competitive Range Determination

After reevaluation, the SSA established a new competitive range.  The SSA once again evaluated all offers and determined "which were the most highly rated and eligible for inclusion in the competitive range relying on the merits of each offer."  AR 13718.  Each offer's merits were determined by (1) the "quality of the technical (non-price)  proposal based on the ratings of each proposal against all evaluation criteria, as defined" by the solicitation; (2) "the Present Value (PV) analysis of the price proposals as defined in" the solicitation.  AR 13719.[4]  The SSA's competitive range determination was based upon the TEB Chairperson's comparison of the four offers' ratings, comments, and assessments of weaknesses, significant weaknesses, and strengths.  The new determination, including a weighing of both technical and price considerations, was documented for the record.  The SSA explained that the competitive range determination would be made based on a "comparative assessment of proposals against all selection criteria in the Solicitation."  AR 13723.

1.    Technical Proposal

Given that PBV's offers received Marginal to Poor ratings, the SSA found that none of PBV's bids were highly rated enough to be included in the competitive range.  The SSA determined that both of PBV's Westwind proposals lacked sufficient information on PBV's approach for successful completion of contract requirements and failed to discuss a strategy for sequencing the work as required by the solicitation. The SSA also found that PBV's Westwind #1 & Westwind #2 proposals were riddled with weaknesses under all three evaluation factors.  The SSA determined that PBV would have to make multiple, substantial revisions to its proposal to be considered for award.

Additionally, the SSA found that both of PBV's Westwind proposals raised issues that were not readily correctible.  The SSA explained that "[to] be considered readily correctable, the change would be a minor revision,

---

[4] Although the solicitation required offerors to meet Office of Management and Budget ("OMB") standards prior to award by qualifying as an operating lease, the SSA stated that her determination of the competitive range would not yet consider whether an offer would score as an operating lease treatment by OMB Standards.

rather than a wholesale redesign of the proposed interior layout or site plan that would not tax the VA's time and resources." AR 13722-23. She concluded that both of PBV's Westwind proposals contained significant departures from the VA's concept floor plan, as entire departments or functions were relocated, creating operation problems for management of clinic resources. The SSA determined that this issue was not readily correctable because it would require a major re-design effort.

Lastly, the SSA determined that PBV's Westwind offers failed to provide the required financial statements on the annual net income or cash flow of PBV's current projects. The SSA found that PBV's failure to provide these required financial statements presented an unacceptable risk to the contract because neither offered the minimum information needed to verify PBV's ability to fund the project and its liquid assets. Although both PBV's Westwind offer's O&M Plan met the minimum solicitation requirements by providing a basic maintenance plan using the solicitation as a template, the offers failed to explain how PBV would manage and implement PBV's quality assurance plan, failed to include information on how plaintiff would manage its Operations and Management subcontractor, did not identify the subcontractor that would be on site, and did not describe the subcontractor's experience level.

The SSA also concluded that PBV's [          ] offer had several significant weaknesses that were not readily correctable, including issues with parking and site circulation. Although she determined that the site was well situated near amenities and public transportation, provided easy access to surrounding streets, and was well maintained, she noted that the parking plan lacked dedicated garage spaces, the garage apparently lacked an elevator, which was required by the solicitation, the garage was further away from the Community-Based Outpatient Clinic ("CBOC"), and the site did not have a clear walking path connecting the CBOC to the garage. The SSA found that the occupied buildings surrounding the site prohibited correction of these issues.

Additionally, the SSA stated that PBV's [          ] offer lacked sufficient information on PBV's approach to successfully complete contract requirements and did not address its plan to sequence work, and she found that PBV's offer failed to provide required financial statements on the income or cash flow of PBV's current projects. This lack of information presented an unacceptable level of risk, she found, as the agency would be unable to verify PBV's liquid assets and its ability to fund this project. Although the SSA determined that the PBV's O&M Plan met the minimum solicitation requirements by providing a basic maintenance plan using the

solicitation as a template, the SSA found that it failed to explain how PBV would manage and implement PBV's quality assurance plan, did not include information on how plaintiff would manage its Operations and Management subcontractor, did not identify the subcontractor that would be on site, and did not describe the subcontractor's experience level.

The SSA found that with SASD's Highly Successful Technical Quality rating, the technical proposal was conditionally acceptable. The SSA explained that conditionally acceptable means that even though the proposal may have deficiencies and weaknesses, the deficiencies and weaknesses do not limit SASD's understanding and ability to complete the project successfully. The SSA found that SASD's offer presented a building design with high quality materials and construction, access to daylight, and incorporating wellness and wayfinding concepts. The SSA determined that SASD's proposal also included detailed information about its financial plan, including information on its cash flow to provide for up-front costs, and financial statements sufficiently showing SASD's financial capability. The SSA found that because the solicitation required evidence of independent CPA verification and three years of tax returns, SASD's failure to provide these documents was considered a readily correctable omission as the SSA found that this issue was readily correctable. The SSA determined that this issue was readily correctible because the omitted information "is highly likely to be available within days upon request, as the documentation should already exist based on the documentation reviewed." AR 13724.

2.    Price Proposal

The SSA explained that her competitive range determination would be based on a comparative assessment of all the proposals against the solicitation requirements. The SSA determined the price rankings of each of the proposals, and then the SSA made her final competitive range determination by weighing the technical proposals and the price proposals of each offer.

PBV's Westwind Offer #2 was ranked first out of four offers in terms of price as it provided the lowest composite annual price among all offers. SASD's offer was ranked second out of four offers as it provided the second lowest composite annual price among all offers. PBV's Westwind Offer #1 provided the third lowest composite annual price among all offers. PBV's [        ] proposal was ranked fourth out of four offers.

The SSA eliminated PBV's Westwind Offer #1 from further consideration because of the combination of the proposal's Marginal

technical rating and its price ranking.  It was ranked third for its price, with a PV of $55.52/sf for 20-year lease and received a Marginal Technical Quality Rating, demonstrating PBV's failure to fully meet solicitation requirements, and the SSA found that the offer contained weaknesses and significant weaknesses that were not readily correctable. While the SSA found that the risks presented by a Marginal rating were not as significant as a Poor rating, the SSA concluded that the Marginal rating still presented a great risk to the project.

Although PBV's Westwind Offer #2 had the lowest price out of all the offered leases, with a PV of $42.08/sf 20-year lease, it received a Poor Technical Quality rating, the lowest possible rating, meaning that the proposal contained uncorrected or uncorrectable deficiencies. The SSA found that such deficiencies presented an unacceptable, high risk of unsuccessful performance on the contract.  This offer, she found, also contained significant weaknesses and omissions, showing that the offeror did not understand the VA's requirements.  The SSA found that this lack of understanding presented a risk to the project's cost and schedule, and thus, she eliminated this proposal from consideration.

PBV's [          ] proposal was the most expensive lease offered, with a PV of $66.56/sf 20-year lease, which is $15.64/sf more than SASD's offer. This proposal also contained significant weaknesses and deficiencies that the SSA found were not readily correctable.  The SSA determined that the proposal's Marginal Technical Quality rating presented an unacceptable, high risk of unsuccessful performance on the contract.  She thus eliminated the [          ] proposal from consideration because of its Marginal Technical Quality rating combined with the fact that it offered the most expensive proposal.

SASD's proposal had the [      ] lowest price offered, which was [ ] % below the prospectus rental rate.[5]  Additionally, the SSA stated that "there is a good chance that the cost/price can be improved to the Government's benefit after discussions."  AR 13724.  SASD received a Highly Successful Technical Quality rating, and the SSA found that SASD's deficiencies were readily correctable, and thus, did not present risks to successful contract completion.  The SSA again selected SASD as the only proposal in the competitive range determination because of the combination of SASD's price proposal and its Highly Successful Technical Quality rating.

---

[5] The prospectus rental rate is $88.94/NUSF (2020 escalation) for a 20-year firm term with a 24-month construction period.

In conclusion, the SSA concluded that all three of PBV's proposals presented risks such that the offers could not be placed in the competitive range for further consideration.  The SSA determined that the competitive range would consist only of SASD's proposal, which, even though it could not be awarded outright, had correctible weaknesses.

The agency sent plaintiff three letters notifying PBV of the elimination of its offers from the competitive range.  According to the representations of the parties during the oral argument held on December 8, 2020, the VA has not yet awarded the contract to SASD, and the VA has not yet conducted a second round of discussions with SASD.  Plaintiff filed its complaint here on August 20, 2020.

DISCUSSION

Plaintiff has many arguments challenging the VA's reevaluation of offers and the procurement itself: (1) the VA acted arbitrarily and capriciously when it conducted evaluations;  (2) the VA acted unreasonably in performing its OMB scoring analysis; (2) the VA unreasonably established its competitive range determination; (3) the VA engaged in disparate treatment of PBV vis-à-vis SASD; (4) the VA's reevaluation was insufficient; (5) the solicitation violates the Anti-Deficiency Act; (6) the VA's conduct shows bias against PBV.

Our review is deferential in accordance with the standard set forth in the Administrative Procedures Act, 5 U.S.C. § 706, which is to say that we review agency action in a procurement for illegality and a lack of rationality. *Impressa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001).  So long as the agency's decision was not irrational or otherwise illegal, we will leave it undisturbed.

I.      Defendant's and Intervenor's Partial Motion to Dismiss

Defendant argues that plaintiff's Anti-Deficiency Act and bias claims were waived and thus should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim.  Intervenor contends that plaintiff's ADA claim should be dismissed under Rule 12(b)(1) for lack of standing, under the Doctrine of Laches, or alternatively under Rule 12(b)(6) for failure to state a claim.  Intervenor also argues that plaintiff's bias claim should be dismissed under Rule 12(b)(1) for lack of standing, or alternatively under the Doctrine of Laches.  As explained below, we grant defendant's and intervenor's partial motion to dismiss plaintiff's ADA and bias claims under Rule 12(b)(6) for

failure to state a claim on the grounds of waiver. It is thus unnecessary to address intervenor's additional arguments in favor of dismissal.

PBV alleges that an award of a 20-year lease under this solicitation would violate the Anti-Deficiency Act, 38 U.S.C. § 8104, because the ADA requires congressional approval for funding certain federal medical facilities and the authorizing legislation for this procurement contains a limitation that the lease should end no later than 2032. Plaintiff argues that the legislation's limitation of the lease period prevents the full execution of a 20-year lease, as award of the lease in 2020, or later, will go several years beyond the congressional authorization. The government responds that plaintiff has waived this argument because PBV did not raise this argument prior to submitting a bid. We agree.

The solicitation was clear on its face that a 20-year lease was contemplated. If plaintiff was concerned with the legality of such a contract, the time to complain was prior to bidding. Not having done so, the issue was waived. *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1314 (Fed. Cir. 2007) (quoting *N.C. Div. of Servs. for the Blind v. United States*, 53 Fed. Cl. 147, 165 (2002) (describing "the proper procedure for the offeror to follow is not to wait to see if it is the successful offeror before deciding whether to challenge the procurement, but rather to raise the objection in a timely fashion.")). The rule in *Blue & Gold* has been "applied to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so." *COMINT Sys. Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012). Plaintiff had every opportunity to raise this argument prior to submitting its bid. It is too late now.

PBV also claims that this procurement is inherently biased because of the VA's decision to cancel the prior procurement instead of following through with its proposed corrective action. Plaintiff has three allegations which it claims are evidence of bias. First, plaintiff claims that the VA's decision to cancel the 2018 procurement instead of taking corrective action is evidence of bias. Next, PBV alleges that the agency's decision to re-issue the solicitation on December 9, 2019, with a deadline for offerors to respond by January 8, 2020, gave an advantage to SASD over PBV, as it left little time for substantial revision. Lastly, PBV claims that the VA committed procurement violations and engaged in disparate treatment in both its evaluation and reevaluation of the 2020 procurement. The first two arguments, however, were available to plaintiff prior to submitting its bid for

competition in this solicitation.  Thus, PBV's failure to raise these arguments regarding bias has resulted in waiver of the arguments under *Blue & Gold*.  The last argument in support of plaintiff's bias claim is dealt with on the merits below.[6]  We grant defendant's and intervenor's partial motion to dismiss these allegations for failure to state a claim under Rule 12(b)(6).

II.   Injunctive Relief

We now move to the merits of plaintiff's request for a permanent injunction on the remaining grounds at issue.  A party seeking the extraordinary remedy of an injunction "bears the burden of proving entitlement to relief, central to which are success on the merits and irreparable harm."  *Red River Serv. Corp. v. United States*, 60 Fed. Cl. 532, 541 (2004) (citing *Sofamor Danek*, 74 F.3d 1216 at 1219 (Fed. Cir. 1996)).  When considering whether to grant a permanent injunction, the court must consider whether "(1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief."  *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009).  Although an award of injunctive relief is based on consideration of this four-factor test, failure to achieve success on the merits is dispositive. *See Career Training Concepts, Inc. v. United States*, 83 Fed. Cl. 215, 219 (2008) ("[A] permanent injunction requires actual success on the merits.").

A.   Success on the Merits

PBV advances four challenges to the VA's reevaluation of offers: (1) the VA acted arbitrarily and capriciously when it conducted evaluations; (2) the VA unreasonably established its competitive range determination; (3) the VA engaged in disparate treatment of PBV vis-à-vis SASD; (4) the VA's reevaluation was insufficient.  We find that all four of plaintiff's challenges lack merit.  We consider each in turn.

1.   The VA acted reasonably when it conducted evaluations in this solicitation

PBV makes several arguments regarding the VA's weighing of the relative strengths and weaknesses of PBV's and the intervenor's offers,

---

[6] Even if elements of bias were not waived, we note in the merits discussed below that the agency's reevaluation was reasonable.

including the following: (1) the VA arbitrarily and capriciously assessed weaknesses and failed to assess strengths to PBV's offers; (2) the VA used unstated evaluation criteria in its reevaluation; (3) the VA's evaluation omitted the required consideration of moving costs; (4) the VA arbitrarily and capriciously evaluated SASD's proposal.

a. PBV's Evaluation

PBV contends that the VA's evaluation loosely applied rating definitions to an offer without considering the weaknesses and strengths of the offer.  We find no merit to these allegations.  The TEB and SSA documented the strengths and weaknesses of each offer in a descriptive, narrative format.  The SSA's reevaluation and new competitive range determination clearly considered the relative weight of these ratings, especially of the weaknesses, and determined whether they were easily correctable or not.  The record does not support PBV's contention that the VA mechanically applied adjectival ratings, forsaking any meaningful consideration of the proposals.  We find no basis to question the ratings and subsequent consideration of them.

PBV also argues that the VA arbitrarily and capriciously assessed weaknesses and failed to assess strengths to PBV's offers, including the following two features: an adjacent space offered in PBV's Westwind #1 proposal, and the parking garage offered in its [          ] proposal.  PBV contends that the VA acted arbitrarily and capriciously by assessing both a strength and a significant weakness to the adjacent space in its Westwind #1 proposal.  In the Westwind #1 offer, the VA found that the empty space adjacent to the building could provide a benefit if the right tenant utilized the space, but the evaluator noted that the VA would have no say as to who will lease the newly annexed and adjacent space, thus presenting a risk to the VA. The agency, however, perceived a potential risk and a potential reward in this aspect of PBV's proposal.  We find no inherent irrationality in recognizing both for the same feature.

PBV further argues that the assigned weakness for this location was not warranted because PBV explained in its proposal that "direct access to this north swing space will be closed" after the completion of renovations and "[i]f, but only if the VA agrees, the north swing space could be made available in the future for occupancy by private organization and volunteer groups that provide services to veterans."  AR 3208.  As defendant correctly

points out in its brief, however, PBV did not explicitly promise in its proposal that the VA would have a role in selecting the organization that would move into the swing space.  Thus, it is not irrational for the SSA to have evaluated this as a potential risk.

PBV also argues that the VA failed to recognize the benefits of a parking garage when it considered PBV's [        ] offer.  In its evaluation, the agency apparently assumed that PBV's proposal lacked an elevator in the garage.  Defendant points out that PBV did not make explicit that the garage had an elevator.  Not having made this feature explicit, we find no failure on the part of the agency in not assigning a strength for the parking garage elevator.[7]  It is reasonable for an agency to rely upon the terms of a proposal. It is the offeror who "bears the burden of presenting an adequately written proposal that satisfies the terms of the solicitation . . . and an offeror's mere disagreement with an agency's decision does not render that decision unreasonable." *Poplar Point RBBR, LLC v. United States*, 147 Fed. Cl. 201, 223 (2020) (internal citations omitted).

b.  The VA did not apply unstated evaluation criteria

The SSA and TEB Chairperson framed their reevaluation around the comments to the original evaluation but indicated that comments highlighted by grey shading "were not considered."  AR 13683.  There were many such highlights and thus numerous comments concerning weaknesses and deficiencies which were not taken into account in the reevaluation.   In explaining what was done, however, the SSA created some confusion and thus room for an argument by plaintiff.  The entire explanatory paragraph reads as follows: "Comments highlighted in Grey were not considered by the SSA & TEB Chairperson; believed to be non-applicable to the requirements of the Solicitation.   These comments did not contribute to the TEB Chairperson's overall rating."  *Id.*  From this, plaintiff creates an argument that is based on the assumption that if a weakness or deficiency were highlighted anywhere in any of the three proposal evaluations none of the evaluation criteria associated with that weakness should be applied to any of the other proposals.  Plaintiff argues that the VA inconsistently removed

---

[7] We also find that it was rational for the VA to consider other weaknesses of parking in the [        ] proposal, such as the walking distance of the garage to the clinic.

16

items from consideration in the reevaluation, resulting in the application of evaluation criteria which was not stated in the solicitation.

Without going into the details put forward by plaintiff, it is sufficient to observe that virtually the entire argument is based on a false premise. It is apparent to the court that it was not the SSA's intent to deem all highlighted weaknesses as associated with inapplicable evaluation criteria. Indeed, the extensive commentary left standing, plus the reevaluation commentary makes clear that the only instance of the VA backing away from a solicitation criterion relates to the application of Interim Life and Safety Plan and Infection Control Risk Assessments code-based requirements. As to that one evaluation criterion, the disavowal applied to all proposals containing comments pertaining to this criterion. There is, in short, no inconsistency in the application of evaluation criteria.

c.   Evaluation of Offerors' Moving Costs

PBV argues that the VA's reevaluation omitted the required consideration of the cost of furniture, telecommunications, replications costs, and other related moving costs, and that it was prejudiced because the agency omitted this consideration and failed to document the decision to do so. However, this assertion is misguided. The solicitation only required the inclusion of moving costs in the price evaluation, "if applicable." AR 172. The VA stated before GAO that it did not consider moving costs, explaining that "the cost of relocation of furniture, telecommunication, replication costs, and other move-related . . . were determined not to be applicable in the VA's evaluation of PBV's proposals (or for any other offeror) as these items would not be relocated."[8] AR 13509. We find no reason, nor has plaintiff provided one, to conclude that the decision was wrong.

Moreover, the VA's decision to not account for such moving costs did not disadvantage PBV in any way because the agency did not consider the moving costs in the price evaluation for any offeror. Additionally, there is

---

[8] The agency explained that the VA's current clinic "was constructed over 28 years ago, and at this point the tenant improvements, furniture, and telecommunication equipment are beyond their useful life. The entire facility will need to be updated to align with the VA's more modernized healthcare delivery model." AR 13509.

no evidence that consideration of moving costs would have benefitted PBV in any way.[9]

### d. Evaluation of SASD's Proposal

Next PBV asserts that the VA arbitrarily and capriciously evaluated SASD's proposal because it should have found that SASD's proposal failed to meet several solicitation requirements.  Plaintiff argues that (1) the VA failed to recognize that SASD did not submit a required zoning letter and proposed a site not properly zoned; (2) the VA failed to find that SASD's proposed site is subject to an easement and is therefore not "free of any encumbrances," as required by the solicitation; (3) the VA failed to assess a weakness to SASD's proposal for site adjacencies; and (4) the VA failed to assess a weakness to SASD's proposal because it was unclear whether the stated enhancements and modifications in SASD's proposal were included in its offer.

As to the first issue, the solicitation required offerors to submit a letter from the local zoning authority showing that the offered property meets the VA's intended use as currently zoned.  PBV contends that the VA failed to recognize that SASD did not submit the required zoning letter and proposed a site not zoned for a CBOC.

The solicitation contained two provisions relating to zoning.  First, the solicitation stated that offerors should provide, "A letter/letters from the AHJ [Authority Having Jurisdiction] providing evidence of current zoning of the property/properties being offered at time of initial proposal submission that the property/properties as zoned meets the VA's intended use or how the property could be made to meet the VA's intended use."  AR 156.  There is also, however, a provision which stated that an offeror must:

> Provide evidence of compliance with local zoning laws or evidence of variance, if any, approved by the proper local authority. Provide evidence of compliance with any specific zoning conditions that may be required in order to develop the

---

[9] Defendant argues that consideration of moving costs would likely have harmed PBV's chances of selection for the competitive range determination, as PBV's Westwind proposals included renovations and construction, which would have required the VA to move twice, first to the temporary space made available during renovation and second to the new clinic after renovation.

property. At the discretion of the Contracting Officer, other forms of documentation demonstrating the probability of receiving such variances may be acceptable.

AR 184.

Defendant argues that SASD's proposal met the solicitation's zoning requirement by demonstrating that its proposed site is zoned for a CBOC. The government cites the Kern County zoning map submitted by SASD with its proposal that shows that the offered land is zoned as "M-2" ("Medium Industrial"), AR 8615, and a county zoning ordinance provided by SASD detailing permitted uses for M-2 districts, also, which includes "[c]linic, medical or physical therapy, out-patient only." AR 8622. Intervenor adds that SASD corrected any ambiguity in this regard by including with its revised proposal a letter from the Kern County Planning Director confirming that SASD's location was in the M-2 Zone and that the property met the VA's intended use.[10]

We find this requirement met by the map and zoning ordinance submitted by intervenor with its proposal. This is supported by the VA's letter to SASD requesting a revised proposal, "Per SFO Par. 2.5, [11] you did provide sufficient evidence of compliance with local zoning laws. However, if you do have a letter or email from the local authority to this effect, please include it with your revised proposal." AR 10216. Although this demonstrated that the agency was satisfied that SASD's zoning requirements were met, the VA went on to request a zoning letter from SASD. Thus, the agency treated this issue as one that was readily correctible, and SASD corrected the issue by providing the letter in its revised proposal to the VA.[12]

--------

[10] We note that the record shows that the letter which intervenor refers to in its motion (ECF No. 47 at 30) was actually from the City of Bakersfield Planning Director.

[11] Solicitation paragraph 2.5 is the same language in the block quote above, located on AR 184.

[12] While plaintiff also argues that SASD relied on the wrong zoning authority, we find that the VA had sufficient evidence to conclude that Kern County was the proper zoning authority for SASD's proposed site.

PBV further asserts that the VA failed to recognize that SASD's proposed site is subject to an easement and is therefore not "free of any encumbrances," as required by the solicitation, which stated that the offered site should "be free of any encumbrances or contingencies, including use restrictions, which may limit the rights, responsibilities or liabilities of the parties to the VA lease." AR 156, 184. SASD's proposal included a legal description of the proposed land, and this description identified a public-right-of way easement between Knudsen Drive and Landco Drive.

Defendant and intervenor point out that the solicitation did not require the proposed site to be free from all easements, but merely those that in some way "limit the rights, responsibilities or liabilities of the parties to the VA lease." AR 156. The government further argues that the street containing this public right-of-way is outside the property line of the proposed site, and that, because the road is public, rather than limiting the use of the street or the property, the easement provides additional access to the proposed site.

We conclude that it was reasonable for the VA to not consider a public right-of-way easement as an encumbrance or otherwise a meaningful limitation on the property's use. The easement lies outside of the proposed property line and defendant's larger point is well taken that its actual effect on the property is to ensure greater access.

Relatedly, PBV argues that the VA failed to assess a weakness to SASD's proposal for site adjacencies. The solicitation indicated offerors would be evaluated for the characteristics of their site's location, including site adjacencies. PBV contends that the VA's first evaluation of SASD's proposal was correct when it assessed a weakness for its site characteristics because the development lacked any other class A buildings. PVB asserts that the deletion of this weakness from the VA's reevaluation of SASD was in error because the lack of positive adjacencies had not changed.

The government counters that the agency's explanation during reevaluation shows the rationality of the decision not to find a weakness:

> The TEB Chairperson & SSA determined the comment regarding the site not being around any other Class A buildings inapplicable. SFO Section 1.11, Site Selection Criteria, lists the minimum characteristics which the site offered must meet. Being in "close proximity to other Class A buildings," per the

> Evaluator's comment, is not a requirement of the [solicitation] and therefore, the comment did not contribute to the Offeror's overall rating.

AR 13711.  Defendant also points out that, although the "Quality of Site Characteristics" section of the solicitation identifies "site adjacencies" as a consideration, AR 173, nothing in the solicitation states that the presence of other Class A buildings benefits a proposed site. Thus, the government contends that PBV failed to demonstrate that this observation should be considered a weakness.[13]

PBV next argues that the VA should have assessed a weakness to SASD's proposal because it was unclear whether the stated enhancements and modifications were included in the proposal, triggering the need for further clarification.  PBV argued that because TEB was unable to determine what elements of SASD's design were included in the offer, this aspect of the proposal should have received a significant weakness, i.e., "A flaw in the proposal that appreciably increases the risk of unsuccessful contract performance."  AR 10178.

The government contends that, at worst, this omission was an ambiguity and that plaintiff has not shown why the agency should have considered it a weakness.  Thus, in defendant's and intervenor's view, this argument is a mere disagreement with the agency's evaluation.

We agree.  The solicitation did not require that these particular enhancements and modifications be provided in the first place.  Although the VA did not assign a strength, likely because it was unclear whether these enhancements would convey, that does not mean that a weakness was appropriate.

> 2.    The VA reasonably established its competitive range determination

Plaintiff asserts that the competitive range determination was flawed because the VA failed to properly conduct its OMB scoring analysis. Plaintiff relies on language stated in the solicitation that a lease is awardable only if the lease scores "as an operating lease under Office of Management

---

[13] The solicitation defines a "weakness" as "[a] flaw in the proposal that increases the risk of unsuccessful contract performance."

and Budget Circular A-11, Appendix B." AR 162. In the reevaluation, the VA conducted an OMB scoring analysis and found that only SASD's offer and PBV's Westwind #2 offer scored as operating leases. PBV argues that the VA conducted its OMB scoring analysis improperly as to both SASD's and PBV's proposals. The short answer to these arguments is that what is in front of the court is only the reevaluation and the competitive range determination and not the award. The record is clear that the CO did not use the OMB scoring analysis as a device to make the competitive range determination.

PBV also contends that the competitive range determination was flawed because it resulted in a competitive range of one offeror. The government responds that FAR § 15.306(c) gives an agency discretion in establishing a competitive range with only one offeror, as FAR merely requires an agency to consider the "most highly rated proposals." *Sys. Dynamics Int'l v. United States*, 130 Fed. Cl. 499, 514 (2017) (quoting FAR § 15.306(c)). Thus, this court has found that an agency's competitive range determination composed of only one offer is reviewed under "the usual arbitrary and capricious standard . . . ." *Id.* at 515.

Here, the VA offered a detailed explanation for its decision to include only SASD's offer in the competitive range. The agency described PBV's proposals as containing many weaknesses which were not "readily correctable," and would require "multiple revisions to their proposal in order to be realistically considered for award."[14] AR 13722. Additionally, while the VA rated several of the technical factors in PBV's proposals as "Marginal" or "Poor," the VA rated those same factors in SASD's proposal as "Highly Successful." AR 13719. In short, the agency determined not only that SASD's proposal was the most highly rated, but that the three remaining proposals were qualitatively so much poorer that there was no point including any of them in the competitive range. Because we find no error in the agency's assessment of the four proposals and their correctability, as explained below, we find that the VA's decision to place only the most highly rated proposal, SASD's proposal, within the competitive range is supported by the record and is not arbitrary or capricious.

### 3.   Disparate Treatment of PBV

_____

[14] "To be considered readily correctable, the change would be a minor revision, rather than a wholesale redesign of the proposed interior layout or site plan that would not tax the VA's time and resources." AR 13722.

PBV contends that the VA treated PBV disparately in its evaluation of similar aspects of PBV's and SASD's proposals.  Plaintiff begins by observing that the identification of an issue as readily correctable by an evaluator played an important part in the assessment of adjectival ratings. PBV then argues that the agency evaluated PBV and SASD disparately by exaggerating the importance of issues raised with respect to PBV's proposals, issues which plaintiff alleges were readily correctable, and disregarding issues with SASD's proposal that plaintiff alleges were not correctable.

The issues which the VA considered weaknesses but PBV claims should have been considered readily correctable include landscaping, wayfinding (signage), trash enclosure locations, pharmacy entrances, lack of financial information, lack of pedestrian walkway identification, and reception desk orientation.  Other than identifying the weaknesses the agency assigned to PBV's proposals which plaintiff believes were readily correctible, plaintiff does not further explain why the listed weaknesses in PBV's proposals should have been considered readily correctable.  Plaintiff also argues, in its reply, that had the VA considered several of plaintiff's flaws as readily correctible, then PBV's adjectival ratings would have been higher. [15]

The government argues that an agency can find an item to be readily correctible and still assign it a weakness, as a weakness is defined as "[a] flaw in the proposal that increases the risk of unsuccessful contract performance."  AR 10178.  To find that a flaw is readily correctable, "the change must be minor, rather than a total redesign of the proposed interior layout or site plan that would tax the VA's time and resources to review and approve."  AR 13686.  In its evaluation, the VA detailed the reasons why it

---

[15] PBV most likely refers to a few of the adjectival ratings which the solicitation defines: "Highly Successful: Meets and to some extent exceeds evaluation standard; no Deficiencies or Significant Weaknesses are present. May contain a few Weaknesses which are readily correctable. Contains several Strengths. Successful: Meets evaluation standard; Deficiencies, Weaknesses and Significant Weaknesses are readily correctable.  Marginal: Does not fully meet the evaluation standard; contains a number of Weaknesses or Significant Weaknesses which are not readily correctable." AR 10177-78.

assessed PBV's proposals weaknesses and significant weaknesses, as it found these issues were not readily correctable.

As defendant argues, plaintiff's allegation does not support a disparate treatment claim. It is instead a thinly disguised disagreement with the agency's belief that the stated weaknesses were not easily correctable. To prevail on a disparate treatment claim, "a protestor must show that the agency unreasonably downgraded its proposals for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." *Off. Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020) (quoting *Enhanced Veterans Sol., Inc. v. United* States, 131 Fed. Cl. 565, 588 (2017)). PBV has not shown that the VA "unreasonably downgraded its proposals for deficiencies that were 'substantively indistinguishable' or nearly identical from those contained in other proposals." *Id.*

PBV further alleges that the VA engaged in disparate treatment when evaluating SASD's and PBV's proposals by assessing weaknesses to PBV and not to SASD for similar issues, including: (1) the number of fixtures in restrooms; (2) views of the highway; (3) distance of proposed parking; and (4) financial information provided. Finally, plaintiff argues that it was treated disparately when the VA decided to remove PBV's offers from the competitive range without first giving it the chance to have discussions.

For the first issue, PBV claims that the VA assessed a weakness to its Westwind #1 proposal for including two family restrooms in the lobby with only one toilet (i.e., single usage), but unfairly did not assess a similar weakness to SASD's proposal for including family restrooms with only one toilet, a textbook example of treating the same issue differently across offerors.

We disagree. The government correctly points out that intervenor's proposal was not the same in this regard. In addition to the two single use restrooms containing one toilet fixture each, SASD's site also offered separate men's and women's restrooms that each included three toilet fixtures. PBV received a weakness for only including two single use restrooms in the lobby because the VA's reference concept design, included in the solicitation, included two family restrooms in the lobby, both of which had three fixtures each. Thus, PBV's proposal, which included two family restrooms with only one fixture each, had less to offer than the concept

design, and SASD's proposal, which included two single-gender restrooms with three fixtures each and two single-fixture restrooms.

PBV also contends that the VA assessed weaknesses to PBV's Westwind offers for having a highway view, while ignoring the fact that SASD's proposed site has a highway behind it, also providing a highway view.  Defendant responds that PBV's argument regarding the highway discrepancy ignores the distinct features that each site offers.  The Westwind site immediately abuts a highway, that is visible from the parking lot and three sides of the facility.  On the other hand, SASD's proposed site is further removed from the highway and borders it on only one side.  Thus, the government argues that the VA appropriately exercised its discretion in evaluating the distinct features of the two sites differently.

We agree.  The record supports the distinction between the two sites.[16] They are differently situated with respect to highways and thus were not treated disparately.

PBV next contends that the VA treated PBV's [          ] proposal and SASD's proposal disparately by criticizing the [          ] parking as distant from the CBOC when much of SASD's proposed parking appeared to be just as far from the CBOC as PBV's proposal.  PBV also contends that the VA incorrectly assumed that the [          ] site did not contain an elevator in the proposed parking garage and a clear walking path from the garage to the CBOC.  However, it was reasonable for an agency to rely upon the terms of the proposal as written.  It is the offeror who "bears the burden of presenting an adequately written proposal that satisfies the terms of the solicitation . . . and an offeror's mere disagreement with an agency's decision does not render that decision unreasonable."  *Poplar Point RBBR, LLC v. United States*, 147 Fed. Cl. 201, 223 (2020) (internal citations omitted).

Intervenor responds that the issue regarding the distance of the parking lot from the CBOC differs between PBV's and SASD's proposals. While PBV's [          ] proposal had a parking garage located a distance away from the CBOC, SASD's proposed location had dedicated parking near the CBOC facility, as well as additional parking located at a distance from the CBOC.

---

[16] We find that these distinctions are readily apparent in the record, and thus, were appropriate to have been made by the agency at the time.

We find that the VA did not treat PBV's [        ] proposal regarding the parking plan disparately in comparison with SASD's proposal, as the parking plans were different in several respects, and the VA reasonably relied on the wording of PBV's proposal. The distance of the parking lot to the CBOC was not the only issue the VA considered with respect to PBV's [        ] parking plan. The TEB Chairperson had several concerns with the [        ] parking plan, including a lack of dedicated parking spaces, lack of an elevator in the garage, and lack of a clear walking path from the garage leading to the main entrance of the CBOC. Her evaluation also mentioned that the proposal was unclear as to who owns the parking garage and how "that may impact other areas of the lease such as maintenance." AR 13703. Additionally, she commented that for the "Parking to the west of the site, people [will] have to cross the main entry off of [        ] [in order to enter the CBOC]." AR 13703.

With respect to whether there was an elevator in PBV's proposed garage at the [        ] site, it was reasonable for an agency to rely upon the terms of the proposal as written. It is the offeror who "bears the burden of presenting an adequately written proposal that satisfies the terms of the solicitation . . . and an offeror's mere disagreement with an agency's decision does not render that decision unreasonable." *Poplar Point RBBR, LLC v. United States*, 147 Fed. Cl. 201, 223 (2020) (internal citations omitted).

Next, PBV argues that the VA showed disparate treatment when it evaluated PBV's and SASD's proposals regarding financial documents that were missing. In this respect, in its Notice of Corrective Action to GAO, the VA stated that it "will reevaluate financial documents provided by SASD and will treat the omission of required documents as a weakness." AR 13667. In the reevaluation, however, the TEB Chairperson and SSA found only an omission in this regard for intervenor. All three of PBV's offers were assessed weaknesses for failure to provide financial information.

Defendant argues that the different results are justified because the missing financial information differed greatly as between the two offers. The reevaluation comments explain that PBV failed to provide financial statements backing up loan commitment letters and failed to identify what its expenses were, which made determination of PBV's net income or profitability impossible. The evaluator's stated that "Without the Financial Statements required by the [solicitation], the VA was unable to interpret

PBV's liquid assets and their ability to fund this project." AR 13689-90. On the other hand, SASD provided evidence of cash-on-hand resources as well as personal financial statements for the principals. Thus, "TEB determined that these submittals adequately demonstrated the offerors' financial capability," despite the omission of tax returns for the previous three years. AR 13713. The two omissions thus were, according to the government, not a comparison of apples to apples.

Intervenor adds that the agency's actions were consistent with its notice to GAO that it would "review the evaluation of SASD's initial proposal with regard to the submitted financial documents and will assign a new adjectival rating as needed." AR 13674. It argues that this was done as evidenced by the evaluator's comments, which show the VA's reasoning for again assessing an omission to SASD rather than a weakness:

> The offer included a strong, detailed financial resources plan, including cash on hand to fund up-front costs, and financial statements that adequately demonstrated the offerors' financial capability. However, since the SFO does call for evidence of independent CPA verification and three years of tax returns, the TEB Chairperson and SSA acknowledge these as omissions. This deficiency is readily correctible as the omitted documentation, causing the technical deficiency, is highly likely to be available within days upon request, as the documentation should already exist based on the documentation reviewed.

AR 13724. Thus the SSA and TEB Chairperson found that SASD's missing financial information was "an omission because failure to submit this documentation does not present the same risks as being a deficiency . . . ." AR 13713. On the other hand, the evaluators determined that PBV's Westwind offers lacked significant financial information warranting a weakness.

> PBV presented several loan commitment letters and claimed substantial gross income from existing projects, but failed to provide the required financial statements or information on their current projects' actual net income/cash flow. The lack of Financial Statements, as required by SFO Section 2.4.2(B)(2), introduced an unacceptable level of risk since PBV failed to provide VA the necessary minimum documentation necessary

to verify PBV's liquid assets and their ability to fund this project.

AR 13723.

We find that it was reasonable for the agency to have made differing assessments of PBV's and SASD's proposals in this regard as the missing documents were materially different in kind.  It was not unreasonable for the agency to have found the information omitted by plaintiff to read more heavily on the question of financial capability.  There was no unequal treatment.

Finally, plaintiff argues that it was treated disparately when the VA decided to remove PBV's offers from the competitive range without first giving it the chance to engage in discussions.  PBV argues that it was particularly unreasonable for the VA to compare SASD's offer, which had benefitted from two previous rounds of discussions with the VA, to PBV's offers which did not receive this same benefit.  Thus, PBV concludes that in order to have an equal competitive range determination, the VA needs to consider if PBV's offers would stand a reasonable chance of award after discussions.

We disagree.  The agency's competitive range determination stressed the importance of the correctability of weaknesses and deficiencies in its determination of which proposal to include in the competitive range demonstrating that the VA gave PBV the benefit of that same inquiry in the new, and independent solicitation.

4.    The agency provided sufficient documentation in its reevaluation

Finally, PBV contends generally that the VA's reevaluation, after the GAO protest, was insufficient because the VA did not reconvene the TEB for a new evaluation and because the SSA and the TEB Chairperson, who both conducted the reevaluation, did not explain any differences with the TEB's evaluation.  PBV further alleges that SSA and TEB Chairperson erred by changing evaluator comments and rating PBV's proposal more harshly than the first evaluation without providing a sufficient explanation.  Plaintiff points to the ratings of the evaluation and reevaluation of the [          ] proposal's Qualifications and Past Performance, in which the proposal received a successful rating in the evaluation and a marginal rating in the

reevaluation.   PBV argues that the SSA and TEB Chairperson downgraded the [            ] proposal without explanation.

The government responds that agencies are not required to start from scratch when they find that reevaluation of a procurement is needed and argues that the SSA and TEB Chairperson fully documented the aspects of the evaluation in which they disagreed with the assessment of a strength or weakness previously assessed, specifically in detailing why a rating of Marginal was warranted for the Qualifications and Past Performance factor of PBV's proposals.

We agree. The Federal Circuit has "consistently reviewed agencies' corrective actions under the APA's highly deferential rational basis standard." *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 992 (Fed. Cir. 2018).  We find that the SSA and TEB Chairperson adequately documented their disagreements with the evaluator's earlier assessments and explained the reasoning for the changes to ratings.

CONCLUSION

Plaintiff has not established that the VA was unreasonable in its reevaluation or that it acted in an arbitrary or capricious manner in making its competitive range determination.   Plaintiff's arguments regarding the lease length and the prior evaluation come too late.   With respect to other challenges, we find that the VA properly conducted its reevaluation decision. Not having shown success on the merits, we need not consider the other injunctive factors.   No relief is warranted.   Accordingly, plaintiff's motion for judgment on the administrative record is denied.   Defendant's and intervenor's cross-motions are granted.   The Clerk of Court is directed to enter judgment for defendant.   No costs.

<u>s/Eric G. Bruggink</u>
ERIC G. BRUGGINK
Senior Judge